[Cite as *State v. Ivy*, 2021-Ohio-3970.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. Craig R. Baldwin, P.J. |
|  | : | Hon. W. Scott Gwin, J |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 20 CAA 09 0034 |
| BRANDON T. IVY | : |  |
|  | : |  |
| Defendant-Appellant | : | OPINION |

CHARACTER OF PROCEEDING: Criminal appeal from the Delaware County Court of Common Pleas, Case No. 20CR I 06 0375

JUDGMENT: Affirmed

DATE OF JUDGMENT ENTRY: November 4, 2021
APPEARANCES:

For Plaintiff-Appellee

MELISSA SCHIFFEL
Delaware County Prosecutor
By: Elizabeth Matune
149 North Union Street
Delaware, OH 43015

For Defendant-Appellant

WILLIAM T. CRAMER
470 Olde Worthington Road
Suite 200
Westerville, OH 43082

*Gwin, J.,*

**{¶1}** Defendant-appellant Brandon T. Ivy ["Ivy"] appeals his convictions and sentences after a jury trial in the Delaware County Court of Common Pleas.

*Facts and Procedural History*

**{¶2}** Stephanie Hunter met Ivy while she was living in Chicago. 3T. at 394.[1] Shortly after Stephanie returned to her mother Carolyn Hunter's home in Powell, Ohio, Ivy came to visit her. Eventually Ivy relocated. Ivy and Stephanie initially lived with Carolyn.

*October 20, 2017: Stephanie reports that Ivy refuses to leave and that Ivy had damaged her car*

**{¶3}** On October 20, 2017, Stephanie went to the City of Powell police station to complain that Ivy had kicked her car and caused damage. She said that Ivy was staying at her house on Thornbury and she wanted him to leave, but he would not. 9T. at 1116-1117. Stephanie told the police that she felt trapped in the garage by Ivy and had to spray mace to escape. 9T. at 1120. Stephanie believed that she had locked Ivy in the garage; however, when officers arrive at the address he was not there. 9T. at 1120-1121. Officers found Ivy in Stephanie's bedroom inside of the house. 9T. at 1121.

**{¶4}** The police escorted Ivy out of the house with a tub of his personal items. Stephanie called a cab for Ivy. Ivy said he wanted to work things out with

---

[1] The transcript of Ivy's jury trial will be referred to as "__T. at __", signifying the volume number and the page number.

Stephanie and did not want to go. Ivy tried to talk with Stephanie, but she said no. 9T. at 1123-1125.

{¶5} That evening, the police were called back to the residence because Ivy was back on the property. 9T. at 1125. Ivy was outside the house and said he wanted to get his phone. Everyone at the residence wanted him gone, so he was arrested for trespass and taken to jail. 9T. at 1126.

### January 2018: Ivy refuses to leave and makes threats

{¶6} On January 5, 2018, Officer Matt Cook of the Powell Police Department responded to a call at the Thornbury address alleging that Ivy was refusing to leave and making threats. 9T. at 1131. Stephanie was afraid and emotional. Stephanie told Officer Cook that she and Carolyn both wanted Ivy to leave, but he refused. Stephanie claimed that Ivy threatened to harm her and kill her son Brandon, and she believed him. 9T. at 1132.

### February 2018: Ivy ejected from Young's office

{¶7} Leslie Young had been with Carolyn for fourteen years and lived with her and Stephanie's adult son, Brandon. After moving out of Carolyn's home, Ivy and Stephanie resided for a time at Young's office. 3T. at 396-397. The couple was asked to leave the office after other tenant's complained that the couple were up all night arguing. 3T. at 398.

{¶8} During this time, Ivy worked for Young at the office. 3T. at 401. Sometime during this period, Stephanie became angry at Ivy for constantly calling her. She confronted Ivy at the office. Young saw the ensuing argument between Ivy and Stephanie outside the office devolve into a shoving match, which resulted in Ivy

pushing Stephanie down to the ground. 3T. at 401-403. Young told the police that Ivy was sleeping at the office, calling Stephanie, getting really loud, and. upsetting the other businesses. The officers from the City of Powell police department helped Ivy leave and took him to his car. 9T. at 1127-1128.

### Late 2018: Stephanie and Ivy share an apartment

{¶9} The couple next moved to the Montgomery Court apartment complex. 3T. at 370; 398. Carolyn witnessed Ivy for no particular reason pick up a chair and throw it across the room. 3T. at 370-371. He then threw a small table.

{¶10} Jennifer Parker a neighbor of the couple at the Montgomery Court apartments saw the police escort Ivy off the property three times. 8T. at 999. She saw Ivy return to the property after the police had gone. Id. Parker recalled seeing a broken window at the couple's apartment and hearing Ivy screaming in pain for her to call 9-1-1 because he had a piece of the glass from the window lodged in his buttocks. 8T. at 1000.

{¶11} Several times Stephanie came to Parker upset, telling her that she wanted to get away from Ivy. 8T. at 998. Stephanie began bringing small items to Parker's apartment for Parker to hold until Stephanie could move out. Parker claimed that Stephanie did this to keep Ivy from destroying the property.

{¶12} Aaron Channell the maintenance technician for the Montgomery Court apartments helped Stephanie try to fix her damaged property multiple times. The maintenance man had to fix Stephanie's door after it had been kicked in and fix a broken window. 8T. at 1008-1009. On one occasion, Channell heard a commotion, walked up to the apartment, and overheard Ivy threatening to kill Stephanie's family and then Stephanie. 8T. at 1013.

{¶13} Ivy threatened Channell when he found Stephanie hanging out with him and other residents. 8T. at 1009. Ivy told Channell stay away, called him names, and said he would put him under. Ivy backed down when the maintenance man stood up to him. Id.

{¶14} When Stephanie decided to move out in late 2018, Channell helped her plan the move. Stephanie was in tears and it looked like it had been a rough evening. She said she was done dealing with Ivy and was leaving. They arranged for a moving company that helped people move in a hurry while somebody was away. 8T. at 1010. Ivy continued to stay at the apartment even after Stephanie turned in her keys. Ivy was still getting mail there and locked himself in to try to avoid getting kicked out.

{¶15} The state presented recorded phone calls between Stephanie and Ivy from January 27, 2019. During the calls, Ivy told Stephanie that if she did not do what he wanted, he would hit her. The state also presented text messages from Ivy saying that she had him "so mad right now." T. at 816-821. The state presented recordings of Ivy threatening to kill Stephanie after she moved out of their apartment. 8T. at 825-826. Ivy can be heard threatening to kick in Carolyn's door and kill everyone, including himself. Ivy said that Stephanie had ruined his opportunities, and all he wanted to do was kill her and that was the only thing that made him feel better. State's Exhibits 14, 15 and 16.

{¶16} After Stephanie moved out of their apartment, Ivy asked Young where she was, but he did not know. Ivy told Young that he wished Carolyn would die because she was in the way of his relationship with Stephanie. Ivy said that if he did not find out where Stephanie was living, he was going to get into Carolyn's house and kill Carolyn and Brandon. Young warned Carolyn and Stephanie about the threat. 3T. at 407-410.

*February 2019: Ivy breaks into Carolyn's house*

{¶17}   On February 8, 2019, Stephanie filed for a protection order against Ivy. 12T. at 828-829. She was granted an *ex parte* protection upon filing. Id. A full protection order would later be granted on April 8, 2019.

{¶18}   On February 28, 2019, officers responded to a call that Ivy was an unwanted person at Carolyn's house. The officers also had the protection order to be served on Ivy. The officers were told that Ivy was upstairs. The officers went inside and called for Ivy to come down but he did not. They eventually found him hiding upstairs in a bedroom closet. Stephanie and Carolyn just wanted Ivy given a trespass warning, so the officers warned Ivy and served the protection order. 3T. at 38; 4T. at 531-532; 9T. at 1135-1137.

*March 2019: Ivy again breaks into Carolyn's house*

{¶19}   In March 2019, Carolyn and Brandon came home to find damage to the back door and the basement door cracked open. They thought someone was inside the house and called the police. Before the police arrived, Ivy came running out of the house. They told him they had called the police and he disappeared. 3T. at 377-379.

{¶20}   On March 22, 2019, police officers and a K-9 officer, Axle, responded to Carolyn's house for a reported burglary in progress. Carolyn reported that Ivy had run from their house, but she was not sure if he had left. The officers began searching the outside of the house with Axle and found nothing but a damaged door, which appeared to be the point of entry. They called for Ivy inside the house and went inside with Axle. While Axle was searching, Ivy came up from the basement. The officers handcuffed Ivy and took him to the police station. At the station, Ivy asked if they could get him out of the burglary charge and claimed that Stephanie set him up. Ivy told the detective that he just

wanted to talk to Stephanie and admitted to hiding in a box in the basement. 11T. at 1138-1140; 11T. at 1145; 11T. at 1149-1150; 12T. at 1204-1206.

{¶21} The prosecution presented a series of text messages from Ivy to Stephanie in February and March 2019. 7T. at 831-837. A sampling of these messages include,

"I rather die before I go to jail"

"This is the end of the rope for me you know I don't want to go back to Chicago I'll die first"

"You gotta think about your family before you try to fuck somebody up because if they can't get you they going to get your family calling the police is not the answer"

"I'm ready to kill myself" followed by "U first"

"I really hate u I wish u wood [sic.] die the thing a make me fill [sic.]better"

"I don't care if I'm free I don't care if I get locked up only thing I want to see is you in a casket"

"Only thing a [sic.] make me feel better is me driving a knife threw [sic.]your chest"

7T. at 831-837; State's Exhibit 128.

{¶22} After Ivy broke into Carolyn's home, Stephanie told Ivy where she was living because she was afraid Ivy would kill Carolyn. 3T. at 409-410.

*June 2019: Ivy arrested at Powell Festival; holds Stephanie at knifepoint*

{¶23}  On June 21, 2019, Carolyn went with Stephanie to the Powell Festival. Ivy went to the festival separately, but met with them to get something to eat. While they were eating, the police arrested Ivy for violating the protection order. When Ivy was arrested, Stephanie told the police that she believed the protection order was cancelled.

{¶24}  While Ivy was in jail, he asked Young whether Stephanie was seeing someone else because she had not been answering his calls. Ivy told Young that he would rather see Stephanie dead than have her be with someone else. 3T. at 408-409.

{¶25}  On June 24, 2019, a couple days after the Powell Festival, Carolyn and Young picked Ivy up from the jail to take him to a shelter. Ivy told them he had a job at a local restaurant, so they dropped him off and proceeded to Stephanie's apartment. When they got there, they saw Ivy walk up and enter the apartment. Ivy saw them sitting in their car, but did not say anything to them. Carolyn went up to the apartment, but the door was locked. She could hear things being thrown inside the apartment and became worried. She pounded on the door and tried to call Stephanie.

{¶26}  Young testified that when they got to Stephanie's apartment, Ivy was running in ahead of them. Stephanie opened the door. When she saw Ivy she tried to close the door and told him he was not supposed to be there. Ivy pushed his way in and locked the door. Carolyn and Young banged on the door until Stephanie eventually spoke with them through the door to say she was fine and they should go home. They refused to leave until they saw her and eventually called the police. 3T. at 411-416.

{¶27}  When police arrived, they could not get any response from inside the apartment. The officers kicked the door in and found that chairs and a table had been

pushed against the door. The officers cleared the apartment and found one of the bedrooms was locked. An officer called through the door and this time Stephanie responded. Within a few seconds, Stephanie cracked open the door and was pulled from the room. Ivy then opened the door and came out. The bed and box spring had been pushed against the bedroom door. Ivy acted nonchalant and said he was just there to get some of his belongings. The police subsequently learned that Ivy was holding Stephanie hostage with a steak knife, which they found hidden under the mattress. Stephanie was in shock and had a bruise forming on her face. Stephanie said Ivy repeatedly punched her in the face. Stephanie thanked the officers for coming because she was not sure what may have happened otherwise. 4T. at 533-534; 10T. at 1215-1227, 1234. While incarcerated for this offense, Ivy told Young that he would rather see Stephanie dead than with someone else. 3T. at 408-409.

*November 22, 2019: Ivy strangles Stephanie causing her death*

{¶28} Ivy was released from jail on November 14, 2019. 3T. at 336; 354-356. Carolyn was staying with Stephanie at her apartment at this time, recuperating from a hospital stay. Ivy had been left at a grocery store near Stephanie's apartment, so she picked him up. Carolyn and Stephanie tried to get Ivy somewhere else to stay, like a shelter, however, it was too late in the evening.

{¶29} Aaron Howard, Ivy's probation officer from a prior conviction involving Stephanie, testified that when Ivy first reported for community control supervision, he said that his sister was taking him to a shelter to stay, but he could not identify the shelter. Ivy was supposed to call back the next day with the name of the shelter, but did not. The probation officer called Ivy's sister and learned that he was staying with Stephanie. The

probation officer then called Stephanie, who put Ivy on the phone. Ivy said he was going to stay with Stephanie until he could find a shelter and Stephanie did not object. At that time, there was no protection order in place or any other orders that would prevent Ivy from having contact with Stephanie. 3T. at 335-339.

{¶30} On November 22, 2019, Stephanie called Ivy's probation officer and said she wanted Ivy to move out because he was doing things that concerned her. Stephanie was at a funeral at the time of the call and Ivy was with her. Stephanie had the phone on speaker so that the probation officer could speak directly with Ivy. Ivy initially denied that he was asked to leave, but Ivy agreed to leave after Stephanie confirmed that she wanted him to leave. At the time, the probation officer had no basis to charge Ivy with a violation, but he called the sheriff and local police to warn them of the situation. 3T. at 339-343.

{¶31} On the way home from the funeral, the plan was to try and find a shelter for Ivy because he needed to leave Stephanie's apartment. 3T. at 361. They did, however, stop by Stephanie's apartment at her request. Id. Carolyn was the driver that day.

{¶32} When they pulled up to the apartment, Stephanie got out of the car and went upstairs to the apartment. A few minutes later, Ivy said something to the effect of needing to use the bathroom and proceeded to exit the car and into the apartment. 3T. at 362-363. Believing Stephanie only intended to be there a few minutes, Carolyn remained in the car.

{¶33} After about fifteen minutes or more passed, Carolyn had grown concerned enough to get out of the car and see what was going on. When she arrived at the apartment door, the door was locked. 3T. at 363. Carolyn used her key to unlock the door.

Id. When she opened the door, she saw Ivy standing right in front of the door. He did not say a word to Carolyn, but instead brushed right past her and fled the apartment.

{¶34} Carolyn was worried because Stephanie's pocketbook was open on a table. Carolyn called for Stephanie, searched the apartment, and found the bathroom door locked. Carolyn called Young and the police.

{¶35} Deputy Maxwell Newman from the Delaware County Sherriff's Office arrived first. 2T. at 230. When he tried and failed to get a response from behind the locked bathroom door, he forced his way into the bathroom where he found Stephanie's body lying on the bathroom floor. She was unresponsive and did not have a pulse, although her body was warm to the touch. Id. at 232-233. Deputy Newman began CPR while he waited on medics. Id. at 233-234. Once Deputies Siegel and Lee arrived, Deputy Newman used an automated external defibrillator to again check for a pulse. Id. at 234-235. There was none detected. Id. at 236. Because the device found no heart activity the machine advised no shock was recommended.

{¶36} Deputy Lee noticed swelling to Stephanie's cheekbone area that was turning purple. While doing CPR, the deputy noted ligature marks on Stephanie's neck. A second deputy also saw ligature marks on Stephanie's neck and maybe some light abrasions on her face. 4T. at 444-445. Deputy Aaron Siegel retrieved an Automatic External Defibrillator ["AED'] device and applied it to Stephanie; however, the machine advised no shock. 4T. at 446-447. The machine issues a "no shock' advisement when the machine is unable to detect any heart activity. 4T. at 446- 47; 466-467.

{¶37} Benjamin Lovell a firefighter paramedic with the Liberty Township Fire Department helped carry Stephanie from the bathroom to the hallway to continue

resuscitation efforts. 4T. at 464. The paramedics placed their own more advanced AED machine on Stephanie. Id. at 466-467. The machine found no electrical activity in the heart. Id. at 465-466.  Lovell then attempted an endotracheal intubation. In doing so, he noticed abnormal swelling and blood within the upper airway of Stephanie's throat. 4T. at 474. Endotracheal intubation requires the paramedic to insert a polished piece of metal with rounded edges referred to as a "Mac blade" just above the epiglottis and raising the epiglottis up to expose the vocal cords. 4T. at 471-472. A soft tube is then maneuvered into the trachea, where a small balloon is inflated to seal the trachea. Id. A bag is then squeezed to push air into the lungs to breath for the patient. 4T. at 472.  Lovell attempted to get the tube into the trachea, but missed  the first time and ended up in the esophagus.  4T. at 475. When the paramedics were unable to get any lung sounds, they realized they were in the wrong tube in the throat and pulled it out to try again. They resumed pumping air with a bag valve mask and were going to try again to intubate Stephanie in the truck.  Id. Lovell admitted that putting the tube in the wrong way can cause swelling and some bleeding. 4T. at 501. However in his opinion, there was no injury from the failed attempt in this case. 4T. at 518-519.

{¶38} When the paramedics got Stephanie into the ambulance, another paramedic, in accordance with standard protocol, attempted the intubation. 4T. at 477.  This attempt was successful.  The team of paramedics began IVs with epinephrine and utilized a mechanical device for CPR chest compressions. 4T. at 478-480.  Once they had the equipment in place, they proceeded to a medical facility and arrived within five minutes.

{¶39} As they arrived at the emergency room, Lovell began noticing blood coming up the tube when air would come out. The medic testified that the blood had to be coming from below the tube and could not have been from anywhere that they made contact with while intubating Stephanie. The medic explained that once the tube is in place, there is a small air balloon that is inflated around it that seals the air passage. As a result, it was impossible for blood to have come from anywhere other than below the tube. 4T. at 485-487.  The paramedic further noted injuries to the head and neck, including red splotches, or petechial, around the eyes and cheeks, which is normally a sign of strangulation. The paramedic noted a ring of discoloration with abrasions around the neck and multiple contusions and bruises around the face. 4T. at 493-495.

{¶40} The Dr. Imran Shaikh the emergency room physician who attend Stephanie noted blood in the tube, but did not know where it came from. The doctor verified that the tube was in the right location and suctioned out the tube to make sure Stephanie was getting oxygen. The doctor said blood in the tube during a cardiac arrest was common and not a concern for treatment purposes. 5T. at 576-580.  The emergency room team worked on Stephanie for nineteen minutes but were unable to restart her heart and declared her deceased. 5T. at 587-588. Dr. Shaikh testified that when someone is strangled, it cuts off oxygen to the brain and causes their heart to stop. 5T. at 593.

### *Ivy goes to the police station*

{¶41} Ivy rode a bike to the Powell Police Department. Ivy's arrival at the Powell Police Department was captured on State's Exhibit 161. Upon arrival, Ivy set

his bicycle down. Ivy disregards an emergency call box and instead looks in a window. Ivy walks away from the Police Department fifty seconds into the video. After approximately six minutes, Ivy pulled the fire alarm in the lobby in order to get the attention of an officer.

{¶42} As the first officer entered the lobby, he saw Ivy stepping from a community room into the lobby. 4T. at 536; 539. The officer asked Ivy if he had any weapons on him. Id. at 539. Ivy responded "no"; however, Ivy then asked the officer to handcuff him. Id. The officers again asked if he had any weapons on him, and he again asked to be placed in handcuffs. Id. at 539-540. This time the officers obliged and placed Ivy in handcuffs. Id. at 540. Once handcuffed, officers asked Ivy what happened. Id. He answered that he went through Stephanie's phone, got into an argument with her about what he saw, he told her he still wanted a relationship, she told him to leave, she "swung on him," and then he "blacked out." Id.

{¶43} Ivy was held at the Powell station until the Delaware County Sheriff's Office came to take custody of him. Detective Rusty Yates interviewed Ivy and noticed that he had scratches on his arms and face. 6T. at 762. Ivy admitted choking Stephanie, but denied hitting her. 6T. at 785; 816. After the interview, Ivy was served with charges and agreed to provide DNA and urine samples. Id. at 777-778. At that point, Ivy said that he was not completely honest because there would be evidence of messages of him begging Stephanie to take him back. Ivy also made a call to his sister and told her that he strangled Stephanie. 6T. at 786.

{¶44} After additional investigation, Detective Yates returned to the jail and interviewed Ivy a second time. 6T. at 782. During the second interview, Ivy said he

would have called for help but his phone did not have service because his phone was prepaid and was out of minutes. Detective Yates testified that cell phone analysis provided GPS activity for Ivy's phone and the GPS would not be available if his phone were dead. Yates later testified that Ivy said he tried to power his phone on to get help for Stephanie, but his phone was dead.

{¶45} The jury was shown video of Ivy's police interview. During the video, Ivy claimed he just went to the bathroom and Stephanie burst in on him complaining that he was taking too long. He cussed her out and she hit him in the face. Ivy claimed he blanked out, but admitted choking Stephanie. Ivy said he tried to call the police, but his phone was dead and Stephanie's phone was locked. Ivy said he loved Stephanie, did not mean for this to happen, and cried during the interview. During the video, Ivy called his sister and told her that he got into an argument with Stephanie, Stephanie hit him, and then he strangled her, and the police were saying Stephanie was dead. At the end of the video, Ivy cried and said he has "mental health" and needs medicine. State's Exhibit 147; 6T. at 775.

{¶46} The jury also heard recordings of jail phone calls from a few days after Ivy's arrest. During the calls, Ivy said they were arguing because he went through Stephanie's phone and found her boyfriend. At the funeral, Stephanie told him he had to leave. When Ivy was in the bathroom after the funeral, Stephanie busted in. They argued a little and Stephanie swung at him. Ivy grabbed her by the neck and choked her. Ivy said it was not long, but she could not breathe after he let go. Ivy said his phone was dead and he could not access her phone, so he rode a bike to the police station, banged on the windows, and pulled the fire alarm. Ivy said he closed

the door so that Carolyn would not see Stephanie and have a heart attack. State's Exhibit 133; 150.

*The Forensic Evidence*

{¶47} Stephanie's autopsy revealed a number of external injuries. She exhibited petechial hemorrhages, or small hemorrhages on the face that are commonly seen in victims of strangulation. 8T. at 930; 945. The skin on her face was mottled and purple, a contrast to the skin elsewhere on Stephanie's body. Id. at 947. Her neck displayed some bruises and small abrasions. Id. at 948. She had linear contusions on both sides of her neck and contusions on both sides of her chin. Id. at 948-949. There were bilateral scleral hemorrhages on both upper and lower eyelids. Id. at 955. All of these external injuries were consistent with a strangulation death. Id. at 930, 945-955. She also had some abrasions on her abdomen. Id. at 952.

{¶48} The muscles in the area of Stephanie's temple showed a hemorrhage that correlated to some kind of injury to the area. Id. at 965-967. Her lungs were filled with blood and fluid, so much so that they were more than twice the weight of normal, healthy adult lungs. Id. at 968. Pulmonary edema has a number of causes, one of which is strangulation. Id. at 969-970.

{¶49} The combination of these injuries led Dr. Russell Uptegrove the forensic pathologist at the Montgomery County Coroner's Office to the conclusion that Stephanie was strangled to death. Id. at 975-976. The pathologist found no injuries to the trachea or esophagus. 8T. at 959-960; 977 DNA samples taken from Stephanie's fingernails contained two major contributors, which were consistent with

Stephanie and Ivy. 9T. at 1077-1080. Dr. Mark Hickman, the Delaware County Coroner agreed with the cause of death as strangulation. 10T. at 1192-1193.

{¶50}  Dr. William Smock, an expert on strangulation testified on behalf of the state. Dr. Smock opined that, based on his extensive training and experience, the injuries to Stephanie's neck muscles uncovered in the layered neck dissection demonstrate that a significant amount of pressure was exerted on her neck during the strangulation. 10T. at 1284-1285. Dr. Smock also related a general timeline of how strangulation effects an individual:

After 5 to 10 seconds, a victim will lose consciousness; the average time to unconsciousness is 6.8 seconds.

Shortly after that, the victim may experience an anoxic seizure as brain damage begins to set in

At 15 seconds, the victim may lose bladder control and urinate

At 30 seconds, the victim may lose bowel control and defecate

At some point between 62 seconds and 157 seconds, the victim will die

10T. at 1266-1267. He further explained that if the perpetrator lets go of the victim's neck, the timeline starts over before these points are reached. Id. at 1288. In addition to those timed events, Dr. Smock also explained that as a person is strangled, their eyes bulge and their face turns blue. Id. at 1272; 1282.

{¶51}  After reviewing all evidence related to Stephanie's death, Dr. Smock's expert opinion was that she was strangled to death via continuous pressure applied to her neck for over a full minute. Id. at 1296-1297.

*Ivy is Indicted*

{¶52} In November 2019, Ivy was indicted in case number 19 CRI 11 0789 with felony murder in violation of R.C. 2903.02(B) and murder in violation of R.C. 2903.02(A), both unclassified felonies and both with repeat violent offender specifications under R.C. 2941.149.

{¶53} In June 2020, an indictment was filed in the current case alleging five counts: (1) aggravated murder in violation of R.C. 2903.01(A), an unclassified felony; (2) felony murder in violation of R.C. 2903.02(B), an unclassified felony; (3) murder in violation of R.C. 2903.02(A), an unclassified felony; (4) felonious assault in violation of R.C. 2903.11(A)(1), a second degree felony; and (5) menacing by stalking in violation of R.C. 2903.211(A)(1), a fourth degree felony. All counts included a repeat violent offender specification under R.C. 2941.149.

{¶54} The state was permitted to amend the indictment to remove the specification from count five and to correct case numbers listed for prior offenses in the other specifications. The 19 CRI 11 0789 case was subsequently dismissed without prejudice and those filings were transferred to the current case.

{¶55} Ivy entered a not guilty plea on the superseding indictment, and he later officially withdrew his intention to pursue his not guilty by reason of insanity plea. *Judgment Entries* filed June 26 and July 20, 2020.

*Ivy decides to represent himself*

{¶56} Just prior to trial, defense counsel moved to withdraw, noting that Ivy expressed a desire to replace defense counsel but then Ivy said he wanted to keep counsel so he could claim ineffective assistance of counsel on appeal. *Motion to*

*Withdraw,* filed July 7, 2020. [Docket Entry No. 33]. On the first day of trial, after jury voir dire and during the first witness, Ivy interrupted the proceedings to complain that his attorneys did not ask the questions he wanted. Ivy asked to represent himself. 2T. at 247-250; 263-277. During a sidebar, the trial court decided to complete the last witness for the day before addressing Ivy's request in detail. Id. The next day, after extensive questioning and admonishing from the trial judge, Ivy filed a written waiver of his right to counsel. 3T. at 282- 319. [Docket Entry No. 54]. Ivy thereafter proceeded pro se with standby counsel appoint by the trial court.

### *The jury finds Ivy guilty of all counts*

{¶57} At the end of trial, Ivy reiterated his prior attorneys' requests for jury instructions on self-defense and involuntary manslaughter as a lesser included offense. The trial court granted the request and instructed the jury accordingly.

{¶58} The jury found Ivy guilty of all five charges. The trial court took evidence on the repeat violent offender specifications at the August 10, 2020, sentencing hearing. Finding the specifications proven, the court merged Counts One, Two, Three, and Four. The state elected to proceed on Count One, Aggravated Murder, for which the Court imposed life without the possibility of parole. The repeat violent offender specification was subsumed by the life sentence. Ivy was also ordered to serve 18 months on the Menacing by Stalking charge.

### *Assignments of Error*

{¶59} Ivy raises three Assignments of Error,

{¶60} "I. APPELLANT'S RIGHTS TO DUE PROCESS UNDER THE FEDERAL AND STATE CONSTITUTIONS WERE VIOLATED BY A CONVICTION FOR AGGRAVATED MURDER THAT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶61} "II. APPELLANT'S CONVICTION FOR AGGRAVATED MURDER WAS NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE.

{¶62} "III. APPELLANT'S CONVICTION FOR MURDER IN COUNT THREE BASED ON A PURPOSEFUL KILLING WAS NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE."

I & II.

{¶63} In his First Assignment of Error, Ivy argues that there is insufficient evidence to support his conviction for Aggravated Murder as set forth in Count I of the Indictment. In his Second Assignment of Error, Ivy contends his conviction for aggravated murder is against the manifest weight of the evidence. Specifically, Ivy contends that there is insufficient evidence of prior calculation and design and that the jury's finding he acted with prior calculation and design is against the manifest weight of the evidence. [Appellant's Brief at 21-24].

**Standard of Appellate Review– Sufficiency of the Evidence.**

{¶64} The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." This right, in conjunction with the Due Process Clause, requires that each of the material elements of a crime be proved to a jury beyond a reasonable doubt. *Alleyne v. United States*, 570 U.S. __, 133 S.Ct. 2151, 2156, 186 L.Ed.2d 314 (2013); *Hurst v. Florida*, 136 S.Ct. 616, 621, 193 L.Ed.2d 504 (2016). The test for the sufficiency of the evidence involves a

question of law for resolution by the appellate court. *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶30. "This naturally entails a review of the elements of the charged offense and a review of the state's evidence." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶13.

{¶65} When reviewing the sufficiency of the evidence, an appellate court does not ask whether the evidence should be believed. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668 (1997*; *Walker*, at ¶30. "The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus. *State v. Poutney*, 153 Ohio St.3d 474, 2018-Ohio-22, 97 N.E.3d 478, ¶19. Thus, "on review for evidentiary sufficiency we do not second-guess the jury's credibility determinations; rather, we ask whether, '*if believed*, [the evidence] would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Murphy*, 91 Ohio St.3d 516, 543, 747 N.E.2d 765 (2001), *quoting Jenks* at paragraph two of the syllabus; *Walker* at ¶31. We will not "disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.'" *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 94, *quoting State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997); *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶74.

**Issue for Appellate Review:** *Whether, after viewing the evidence in the light most favorable to the prosecution, the evidence, if believed, would convince the average*

*mind that Ivy purposely, and with prior calculation and design, caused the death of*

*Stephanie beyond a reasonable doubt.*

{¶66} R.C. 2903.01 defines the crime of aggravated murder, "(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy…" Pursuant to R.C. 2901.22(A), "[a] person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."

{¶67} There is no bright-line test to determine whether prior calculation and design are present. Rather, each case must be decided on a case-by-case basis. *State v. Taylor*, 78 Ohio St.3d 15, 18-20, 676 N.E.2d 82(1997). The Ohio Supreme Court has held, "Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." *State v. Cotton*, 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190(1978), paragraph three of the syllabus. Accord, *State v. Braden*, 98 Ohio St.3d 354, 785 N.E.2d 439, 2003-Ohio-325 at ¶ 61.

{¶68} Accordingly, to sustain Ivy's aggravated murder conviction, the state had the burden of proving beyond a reasonable doubt that, under the facts and circumstances of this case, Ivy had sufficient time and opportunity to plan Stephanie's death, and that,

under the surrounding circumstances, Ivy had a scheme designed to implement a calculated decision to kill Stephanie.

{¶69} "[P]rior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley,* 93 Ohio St.3d 253, 264, 2001-Ohio-1340, 754 N.E.2d 1129. In *State v. Conway,* 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, the Ohio Supreme Court held that one's actions could display a plan to kill. In *Conway*, upon hearing that his brother had been stabbed, Conway retrieved a gun from his car and began shooting at the alleged perpetrator. The Court held that "[a]lthough they took only a few minutes, Conway's actions went beyond a momentary impulse and show that he was determined to complete a specific course of action. Such facts show that he had adopted a plan to kill." Id. at ¶ 46, 842 N.E.2d 996. If the victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design. See *State v. Campbell*, 90 Ohio St.3d 320, 330, 738 N.E.2d 1178(2000); *State v. Palmer*, 80 Ohio St.3d 543, 570, 687 N.E.2d 685(1997); *State v. Taylor*, 78 Ohio St.3d 15, 21, 676 N.E.2d 82(1997); *State v. Mardis*, 134 Ohio App.3d 6, 19, 729 N.E.2d 1272(10th Dist. 1999).

{¶70} In *Taylor* the Supreme Court of Ohio set forth three factors to be used when reviewing whether there is sufficient evidence of prior calculation and design. *Taylor*, 78 Ohio St.3d at 19, *citing State v. Jenkins*, 48 Ohio App.2d 99, 355 N.E.2d 825 (8th Dist. 1976). These factors are: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?'" Id.; *Accord, State v. Franklin,* 97 Ohio St.3d 1, 2002-

Ohio-5304, 776 N.E.2d 26, ¶56. In the case at bar, the facts demonstrate prior calculation and design.

{¶71}  Ivy and Stephanie knew each other, and they had a tremendously strained relationship. The prosecution presented a series of text messages from Ivy to Stephanie in February and March 2019 which included what can be inferred to be death threats by Ivy to Stephanie, as well as threat to harm Stephanie's family.  On June 24, 2019, a couple days after the Powell Festival, Ivy held Stephanie at knife point. While Ivy was in jail, he asked Young whether Stephanie was seeing someone else because she had not been answering his calls. Ivy told Young that he would rather see Stephanie dead than have her be with someone else. 3T. at 408-409. The state presented recordings of Ivy threatening to kill Stephanie after she moved out of their apartment. 8T. at 825-826.  Ivy can be heard threatening to kick in Carolyn's door and kill everyone, including himself. Ivy said that Stephanie had ruined his opportunities, and all he wanted to do was kill her and that was the only thing that made him feel better. State's Exhibits 14, 15 and 16.

{¶72}   In his statements to the police and his sister, Ivy stated that he got into an argument with Stephanie, Stephanie hit him, and then he strangled her.

{¶73} On the day of her death, the plan was to try and find a shelter for Ivy because he needed to leave Stephanie's apartment. After Stephanie had gone into her apartment alone, Ivy followed shortly thereafter. When Carolyn entered the apartment, Ivy said nothing and hurriedly left. Ivy waited over six minutes before he contacted the police.

**{¶74}** Finally, it does not appear that the murder was an instantaneous event, but instead were carried out over a period of time. "[T]he jury could find prior calculation and design, * * * based on the protracted nature of the murder." *State v. Allen*, 73 Ohio St.3d 626, 632, 653 N.E.2d 675(1995). Dr. Smock explained that the average person who is strangled will lose consciousness within 6.8 seconds, although it can take as long as 10 seconds. Both Dr. Smock and the forensic pathologist explained the outward physiological changes that Stephanie would have displayed as time passed, including turning blue or purple and petechiae forming. Further, Ivy had scratches on his arms and Stephanie had his DNA under her fingernails. Dr. Smock testified that it is not uncommon for victims of strangulation to scratch at their assailant in an effort to break the strangulation hold. Because strangulation does not cause instantaneous death, a defendant has "sufficient time and opportunity to contemplate his actions during the course of the murder, and could have chosen to stop the strangulation" prior to the victim's death. *State v. Mount*, 9th Dist. No. 26941, 2014-Ohio-5334, 2014 WL 6783113, ¶ 31; *State v. Malyshev,* 7th Dist. Jefferson No. 17 JE 0029, 2019-Ohio-1087, ¶78.

**{¶75}** Viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Ivy purposely, and with prior calculation and design, caused the death of Stephanie.

**{¶76}** We hold, therefore, that the state met its burden of production regarding the elements of aggravated murder and, accordingly, there was sufficient evidence to support Ivy's conviction.

**Standard of Appellate Review – Manifest Weight.**

{¶77} As to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient. *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668, 1997–Ohio–355*; *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001).

> "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.
>
> * * *
>
> "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, *quoting* 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

{¶78} The reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Murphy*, 4th Dist. Ross No. 07CA2953, 2008–Ohio–1744, ¶ 31. Because the trier of fact sees and hears the witnesses and is particularly competent to decide whether, and to what extent, to credit the testimony of particular witnesses, the

appellate court must afford substantial deference to its determinations of credibility. *Barberton v. Jenney,* 126 Ohio St.3d 5, 2010–Ohio–2420, 929 N.E.2d 1047, ¶ 20.  In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke,* 7th Dist. Mahoning No. 99 CA 149, 2002– Ohio–1152, at ¶ 13, *citing State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125(7th Dist. 1999).  Thus, an appellate court will leave the issues of weight and credibility of the evidence to the fact finder, as long as a rational basis exists in the record for its decision. *State v. Picklesimer*, 4th Dist. Pickaway No. 11CA9, 2012–Ohio–1282, ¶ 24.

**{¶79}**  Once the reviewing court finishes its examination, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"  *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983).  Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction."  Id.

**Issue for Appellate Review**:  *Whether the jury clearly lost their way and created such a manifest miscarriage of justice that the conviction for aggravated murder must be reversed and a new trial ordered.*

**{¶80}**  The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility.  "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or

sufficiency of the evidence." *State v. Craig*, 10th Dist. Franklin No. 99AP–739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP–604, 2003–Ohio–958, ¶ 21, *citing State v. Antill,* 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP–1238, 2003–Ohio–2889, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992). Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), paragraph one of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668 (1997).

{¶81} In the case at bar, the jury heard the witnesses and viewed the evidence. The jury saw Ivy's videotaped statements to the police, viewed the video footage of his actions at the police station, and heard recordings of his telephone conversations while he was incarnated. The jury heard the medical experts' testimony subject to cross-examination. Thus, a rational basis exists in the record for the jury's decision.

{¶82} We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Based upon the foregoing and the entire record in this matter we find Ivy's conviction is not against the sufficiency or the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury heard the

witnesses, evaluated the evidence, and was convinced of Ivy's guilt.  The jury neither lost their way nor created a miscarriage of justice in convicting Ivy of aggravated murder.

{¶83}  Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the crime of aggravated murder for which Ivy was convicted.

{¶84}  Ivy's First and Second Assignments of Error are overruled.

III.

{¶85}  In his Third Assignment of Error, Ivy argues that his conviction for Murder in violation of R.C. 2903.02(A) as set forth in Count III of the Indictment is against the manifest weight of the evidence. Specifically, Ivy maintains that he did not purposely kill Stephanie.

**Standard of Appellate Review – Manifest Weight.**

{¶86}  As to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient.  *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668, 1997–Ohio–355*; *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001).

"[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.

* * *

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, *quoting* 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

{¶87} The reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Murphy,* 4th Dist. Ross No. 07CA2953, 2008–Ohio–1744, ¶ 31. Because the trier of fact sees and hears the witnesses and is particularly competent to decide whether, and to what extent, to credit the testimony of particular witnesses, the appellate court must afford substantial deference to its determinations of credibility. *Barberton v. Jenney,* 126 Ohio St.3d 5, 2010–Ohio–2420, 929 N.E.2d 1047, ¶ 20. In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. Mahoning No. 99 CA 149, 2002–Ohio–1152, at ¶ 13, *citing State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125(7th Dist. 1999). Thus, an appellate court will leave the issues of weight and credibility of the evidence to the fact finder, as long as a rational basis exists in the record for its decision. *State v. Picklesimer*, 4th Dist. Pickaway No. 11CA9, 2012–Ohio–1282, ¶ 24.

{¶88} Once the reviewing court finishes its examination, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be

reversed and a new trial ordered.'" *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983). Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." Id.

**Issue for Appellate Review**: *Whether the jury clearly lost their way and created such a manifest miscarriage of justice that the conviction for murder must be reversed and a new trial ordered.*

{¶89} Pursuant to R.C. 2901.22(A), "[a] person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." As the Ohio Supreme Court stated in paragraph four of the syllabus in *State v. Huffman*, 131 Ohio St. 27, 1 N.E.2d 313(1936):

> The intent of an accused person dwells in his mind. Not being ascertainable by the exercise of any or all of the senses, it can never be proved by the direct testimony of a third person, and it need not be. It must be gathered from the surrounding facts and circumstances under proper instructions from the court.

*State v. Johnson*, 56 Ohio St.2d 35, 38, 381 N.E.2d 637, 640 (1978).

{¶90} It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts. *State v. Nabozny*, 54 Ohio St.2d 195, 375 N.E.2d 784(1978); *State v. Lockett*, 49 Ohio St.2d 48, 358 N.E.2d 1062(1976); *State v. Perryman*, 49 Ohio St.2d 14, 358 N.E.2d 1040(1976); and *State v.*

*Eato*, 19 Ohio St.2d 145, 249 N.E.2d 897(1969). In the case at bar, Ivy admitted to strangling Stephanie. The state presented evidence as to the amount of time necessary to cause death by strangulation, the changes in Stephanie during this period that would be evident to Ivy that death was imminent, and the fact that Ivy could have stopped strangling Stephanie. His continued efforts evidenced his purpose. Further, evidence was presented that Stephanie fought back in an effort to prevent her death, and that Ivy had threatened to kill Stephanie on numerous occasions before Ivy carried out his intent.

{¶91} During Ivy's trial, the jury heard the witnesses and viewed the evidence. The jury saw Ivy's videotaped statements to the police, viewed the video footage of his actions at the police station, and heard recordings of his telephone conversations while he was incarnated.  The jury heard the medical experts' testimony subject to cross-examination. Thus, a rational basis exists in the record for the jury's decision.

{¶92} The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility.  "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence."  *State v. Craig*, 10th Dist. Franklin No. 99AP–739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996).  Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true.  *State v. Raver*, 10th Dist. Franklin No. 02AP–604, 2003–Ohio–958, ¶ 21, *citing State v. Antill,* 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP–1238, 2003–Ohio–2889, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992).  Although

the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), paragraph one of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668 (1997).

{¶93} We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Based upon the foregoing and the entire record in this matter we find Ivy's conviction for murder is not against the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury heard the witnesses, evaluated the evidence, and was convinced of Ivy's guilt. The jury neither lost their way nor created a miscarriage of justice in convicting Ivy of murder.

{¶94}   Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the crime of murder for which Ivy was convicted.

{¶95}   Ivy's Third Assignment of Error is overruled.

{¶96}   The judgment of the Delaware County Court of Common Pleas is affirmed.


By Gwin, J.,

Baldwin, P.J., and

Wise, J., concur