[Cite as *State v. Bowman*, 2022-Ohio-2705.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2021-CA-14 |
| | : | |
| v. | : | Trial Court Case No. 2020-CR-84 |
| | : | |
| RICHARD M. BOWMAN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 5th day of August, 2022.

. . . . . . . . . . .

R. KELLY ORMSBY, III, Atty. Reg. No. 0020615, Prosecuting Attorney, Darke County
Prosecutor's Office, Appellate Division, Darke County Courthouse, 3rd Floor, 504 South
Broadway Street, Greenville, Ohio 45331
        Attorney for Plaintiff-Appellee

H. MICHELE THOMAS, Atty. Reg. No. 0082848, P.O. Box 695, Eaton, Ohio 45320
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Richard M. Bowman appeals from his conviction for aggravated murder in the Darke County Common Pleas Court following a jury trial. In support of his appeal, appellant asserts that the trial court erred in overruling his Crim.R. 29 motions for acquittal and that the conviction was against the manifest weight of the evidence. For the reasons outlined below, the judgment of the trial court will be affirmed.

## I. Facts and Procedural History

{¶ 2} This case arises from the April 24, 2020 death of Teresa Bowman. Following an investigation, Richard Bowman, Teresa's husband, was indicted on one count of aggravated murder, in violation of R.C. 2903.01(A), an unclassified felony.[1]

{¶ 3} A jury trial began on September 21, 2021. The State presented Richard's 911 call, which came in at 11:28 a.m. on Friday, April 24, 2020. On the recorded call, Richard stated that he had just returned home from the grocery store and found his wife of 40 years lying in the garage with blood on her. [2] He claimed he did not know if she had been up on a ladder and fell off, but there was a ladder there and she had marks on her neck. He noted that it looked like she had hit the back of her head on the truck and that there was blood on the truck. He stated that the back of Teresa's head was the only place she was bleeding from and that there was a big blood spot on the ground. Richard asked if he should try CPR and claimed he knew how to do it. During the course of the

---

[1] For ease of reference we will refer to the Bowman family members by their first names in this opinion.

[2] Witnesses in the case described the structure Teresa was found in as a barn, a shed, and a garage. To avoid any confusion, we will refer to the structure only as a garage.

call, Richard was informed how to perform CPR and told to count out loud for the compressions. At one point, because Richard stated there were bubbles coming out of Teresa's mouth, he was told to turn Teresa to her side. Richard indicated that he rolled Teresa over all the way and that he got blood all over himself. He was then told to roll Teresa back over onto her back and to start compressions again.

{¶ 4} Firefighter Douglas Evers was the first responder to the Bowmans' rural residence on Disher Road in Darke County, Ohio. Richard, who appeared a little shaken up, told Evers he had been gone for about two hours and that Teresa was supposed to go out and feed an animal. Richard then took him back to Teresa's body, which was lying face up on the ground just inside the doorway of the Bowmans' garage. Her head was just outside the sliding garage door and her body was inside the garage with her feet pointed toward the truck. Evers found no pulse on Teresa's neck, and she did not appear to be breathing, so he started performing chest compressions for CPR. He did not notice any marks on her neck.

{¶ 5} Dustin Brunner and LeAnn Bruns from the Union City Rescue squad were the next to arrive on scene. Upon arriving, they decided to move Teresa's body fully outside of the garage to get better access to her. After cutting away Teresa's clothing, Bruns analyzed Teresa's heart rhythm. The results showed asystole, meaning that Theresa was not alive and may have already passed away by the time they arrived. However, they still attempted to resuscitate Teresa with their cardiac arrest protocol. Brunner did not notice any blood on Teresa until after he fastened an advanced airway and put his hands behind Teresa's head. Teresa's Fitbit was removed from her left wrist

in order to insert an IV. Despite their efforts, Teresa was declared dead at 12:14 p.m.

{¶ 6} Amber Deregnaucourt and Jennifer Wooley arrived in a second medic vehicle. After Teresa was declared dead, Deregnaucourt talked to Richard, who seemed very accepting that Teresa had died. There was concern for Richard's blood pressure so Deregnaucourt checked his vitals. His blood pressure was high, but Richard stated he had hypertension and was on medication for it. Richard claimed that he had been out running errands for two hours before finding Teresa. Richard stated that he had performed CPR on Teresa before the medics arrived and that he knew how to do CPR because he used to do some athletic training. Deregnaucourt did not notice any blood on Richard's clothing.

{¶ 7} Deputy Kelly Moody of the Darke County Sheriff's Office was the first law enforcement officer to arrive on scene. When he arrived, the medics had already pulled Teresa out of the garage and were still attempting to resuscitate her. Richard told Moody that he had left the home that morning around 9:30 a.m. to run some errands which he described in detail. Richard claimed that the last place he had stopped was the Dollar General in Fort Recovery to pick up some supplies. Richard stated that he had texted his wife before he left the store to see if she needed any bread, and he was adamant that Moody look at Richard's text message that he sent at 11:21 a.m., to which Teresa did not respond. According to Richard, after he returned home, he went inside the house to locate Teresa but could not find her. Then, when he stepped back outside, he noticed the sliding door to the garage was shut; he opened it and found Teresa laying on the ground unconscious. Richard described finding Teresa face up with her head toward the

rear of the truck and her legs underneath the truck's running boards. Richard admitted he moved a ladder when he entered the garage and believed that Teresa had fallen off the ladder. Richard explained that Teresa had suffered a knee injury in the past from a horse, which had caused some walking and balancing issues.

{¶ 8} During Deputy Moody's interactions with Richard, Richard appeared calm but did tear up a little at one point. Although Richard claimed to have performed CPR on Teresa, Moody did not observe any dirt or mud on Richard's jeans or see any blood on Richard's person or his clothes. At the time, Richard was wearing a red long sleeved hooded sweatshirt/jacket with a white emblem on the left breast plate, blue jeans, and brown work boots/shoes.

{¶ 9} Joe VanVickle, the Chief Medical Legal Investigator of the Darke County Coroner's Office, was dispatched to the Bowman residence. Upon arriving, VanVickle, along with Darke County Sheriff's Office deputies Detective Doug Didier and Detective Sergeant Chris Clark, observed the scene in the garage, including the ladder that Teresa allegedly fell from. They did not observe anything in the rafters that Teresa may have needed the ladder to access, and there were no mechanical defects with the ladder itself. They were able to see imprints on the floor where the ladder may have been placed before Richard allegedly moved it, but it did not appear as though the ladder had moved around in the dirt or had fallen over. The floor of the garage was a dirt floor that was a very damp, oily, dark soil, which could track easily. Had someone been crawling around on the ground, one would have expected dirt on their pants or hands. On the floor of the garage toward the driver's side rear wheel of the truck was a large pool of blood and a

smaller spot of blood next to it.

{¶ 10} They did not observe any shoe impressions either on the ladder rung or the running board of the truck. Teresa had a laceration on the back of her head, which was the source of the bleeding. However, they did not observe anything that may have been a point of impact on the truck on which Teresa may have hit her head to produce the injury. The truck had an arching swipe mark of dirt on the driver's side door and a bloody hand print on the running board by the front driver's side of the truck, but there were no dents or scratches from anything hitting the truck. It was later determined that the one latent print of value that had been recovered from the truck's running board matched Teresa's right thumb.

{¶ 11} In examining Teresa's body, VanVickle noted that Teresa had blood on the back of her head from a laceration as well as some on her face that was consistent with her being moved and receiving medical treatment. The inside of Teresa's right hand had blood on it along with soil similar to that found on the garage floor. The backs of both her hands had soil on them, as well as the bottom of her shoes, similarly consistent with the dirt floor in the garage. Due to Teresa's large size and having a short neck, while positioned on her back, her neck was hidden from view. VanVickle did not see any red marks on her neck but indicated it was possible for marks or bruising to become more visible at a later time, such as during the autopsy, when her body would be cleaned and could be manipulated. VanVickle did not see a wedding ring on Teresa's hands and did not observe any indentations from where a ring would have been.

{¶ 12} Dr. Susan Brown performed Teresa's autopsy the day after her death.

Teresa had dirty, muddy areas on her jeans as well as her shoes. In addition to the general blood and dirt that VanVickle observed, Dr. Brown noted that there were two bruises on Teresa's left hand, multiple bruises on her left arm, a laceration on the back of her head, bruising on either side of her lower lip, and an abrasion on her chin. The laceration to her head had been caused by blunt force trauma that probably was not from an impact to a flat surface but more likely caused from being struck with an object or impact from a surface with an edge. There were no skull fractures or blood on her brain, such that the injury would have been sufficient to stun Teresa, but it would not have killed her. The abrasions on her chin and lips could have been caused by falling on her face after being struck in the back of the head. Teresa had multiple bilateral rib fractures as well, but those were believed to have been caused by the CPR efforts.

{¶ 13} Dr. Brown observed several areas of petechiae, or small blood vessels that broke due to an increase in intravascular pressure, causing the accumulation of blood and rupturing of the blood vessels. There was conjunctiva in her eyes, and there were multiple bruises with linear, parallel abrasions around Teresa's neck. The inside deep tissues of Teresa's neck reflected additional bruising. Dr. Brown concluded that Teresa's cause of death was strangulation. She opined it could have been caused by some type of cloth or object, or simply by someone's hands squeezing her neck. Dr. Brown determined that the laceration to the back of Teresa's head occurred prior to the time of death, i.e. the strangulation.

{¶ 14} After learning of the autopsy determination, Detective Didier and several other Dark County Sheriff's Office deputies attempted to confirm Richard's story from the

day before about his path of travel prior to discovering Teresa's body. Didier obtained surveillance video from the Dollar General store that showed Richard entering the store at 11:01 a.m., purchasing a single item, and leaving the store at 11:06 a.m. On the video, Richard was wearing a dark jacket/vest and dark shoes with blue jeans, which were not the same clothes Richard had been wearing when police arrived at his home. Didier also obtained surveillance footage from several other locations near where Richard allegedly had stopped or driven. Richard's vehicle was not observed on any of the surveillance videos collected. As part of his investigation, Didier timed his drive from the Bowmans' rural residence to the Dollar General store in Fort Recovery. The one-way trip took eight minutes and eight seconds.

{¶ 15} On Sunday, April 26, 2020, officers obtained a search warrant for Richard's home while other detectives interviewed Richard at the police station. The clothing that Richard was observed wearing at the Dollar General store was never located, and deputies were not able to find anything that could have been used as the blunt force instrument to strike Teresa in the head.

{¶ 16} Darke County Sheriff's deputy Detective Rachel Prickett responded to the Bowman residence on April 24 after Teresa had been declared dead. As an evidence technician, Prickett photographed the scene, collected blood samples, and attempted to lift fingerprints. Deputy Moody also assisted in taking photographs and collecting evidence, including Teresa's Fitbit and blood samples recovered from the sliding door to the garage. Prickett observed a basket on the ground inside the garage, and she collected a rope near the basket. She did not see any dirt or blood on Richard's clothing.

She looked at the sliding door to the garage when it was partially open, completely closed, and completely open. Although she did not see any blood on the inside of the door, when Deputy Craig Neth was present during the execution of the search warrant on April 26, he collected a small blood sample from the inside of the track. Prickett obtained Teresa's Facebook messages and discovered her last post was made at 10:30 a.m. on Friday, April 24, 2020.

{¶ 17} Richard's interview on April 26, 2020, was audio- and video-recorded. Richard claimed that a pair of his all-black tennis shoes and a Carhartt vest had been stolen from his weight room, and that a cheap gold wedding band that Teresa never took off was missing. He turned over a debit card that contained Teresa's stimulus money on it; he claimed to have found the card in the garage on the floor by the basket that police missed. He also provided his Dollar General receipt for the cooking oil he purchased the day Teresa died. Richard stated that he and Teresa had been married for 40 years, but they had not slept in the same bed for at least the last 20 years and they had separate bank accounts. He acknowledged that he was known to have a girlfriend or two and admitted he had an affair in 2011. He claimed that Teresa was aware he had girlfriends, as were their daughter Cindy and others. He admitted he had female friends but denied sleeping with other women or having sexual relationships with them. Richard indicated that he and Katherine Marker were old friends and that she was a nurse, so when she came to his home after Teresa's death, she said she was going to stay with him a little bit because he had high blood pressure.

{¶ 18} Richard and Teresa both worked the second shift from 3 p.m. to 11 p.m.

Monday through Friday at Clopay in Troy, Ohio. They were both scheduled to work on the day Teresa died, but after Teresa's death, Richard called off. During the interview, Richard was informed for the first time that Teresa had died from strangulation.

{¶ 19} Richard went through his movements on the morning of Teresa's death in step-by-step detail, but he eventually admitted that he had lied about his whereabouts, because he knew the police were going to blame him for Teresa's death. He then claimed that he left the house around 9:30 or 10 a.m. and went to the horse barn to check in on the horses for a minute or two before driving to the Dollar General in Fort Recovery and back. He did not go to any of the other locations he had previously claimed to have visited. He stated that he last saw Teresa putting on her jacket that she wore every day to go out to the garage to feed the dog, and she said she was going to search for something in the garage.

{¶ 20} Richard denied that he killed his wife. He told the detectives that when he came home, he first went inside the house and used the restroom. When he could not find Teresa inside, he went back outside and found Teresa lying face up on the ground in the garage. He claimed he had been crawling around on his hands and knees on the floor during his attempts to perform CPR and rolling Teresa's body around.

{¶ 21} Mary Barger, a forensic scientist in the DNA and serology section of the Miami Valley Regional Crime Laboratory ("MVRCL"), testified that for some of the evidence submitted, no DNA was detected. Blood was indicated on the sample from the left nerf bar (the running board) of the truck, the edge of the sliding door, and from inside the door; all of which matched Teresa's DNA. A partial mixed DNA profile was obtained

from the door handle to the garage, which had blood present. The major DNA component matched Teresa but, although there was enough to say a second person's DNA was present, there was insufficient information to make any conclusions or comparisons of that second person. The sample from the doorjamb was positive for blood and provided a partial DNA profile. Because there was such a small amount, Barger was unable to definitively say that it could match anyone, but she was able to exclude both Richard and Teresa as contributors to the blood on the doorjamb. A rope that was submitted as evidence did not have any blood on it, but samples were tested for touch DNA. The knotted ends of the rope had a mixed DNA profile. While Barger could see indications that Richard and Teresa's DNA may be present, there was not enough DNA to absolutely say that their DNA was present, so she could make no determinations. The straight center portion of the rope showed a mixed DNA profile. Teresa was excluded as a possible contributor but the major male component matched Richard. A hair sample collected from Teresa's jacket was submitted for DNA testing, however, no DNA was obtained from the hair.

{¶ 22} Dr. Keith Diaz testified as an expert in the analysis of Teresa's Fitbit data. He explained the Fitbit is like a watch but has two specific capabilities: an accelerometer and a heart rate sensor. The accelerometer senses motion in three planes (forward and back, side to side, and up and down), and the Fitbit has a proprietary algorithm that analyzes the motions and determines whether a person moved and took a step. According to Dr. Diaz, the accelerometer has high sensitivity to motion and will count any motion as steps.

{¶ 23} Dr. Diaz explained that the heart rate monitor is not quite as accurate as the accelerometer data. As long as the device is worn, the heart rate sensor takes a heart rate reading every 5-10 seconds. The sensor will calculate a heart rate even if a person is deceased and wearing the device based on the way the device gauges heart rate. Due to the wide range of error, the heart rate accuracy of the Fitbit is only considered moderately accurate. What it can tell, according to Dr. Diaz, is whether a person's heart rate is higher or lower over time rather than a specific number of beats per minute.

{¶ 24} Dr. Diaz concluded that Teresa was wearing her Fitbit for almost the entire day on the date of her death and was wearing it at the time of her death. Between 9:47 a.m. and 10:28 a.m., neither a step nor a heart rate was recorded. Dr. Diaz concluded that for that 42-minute period, the most plausible explanation was that Teresa was not wearing her Fitbit. Between 10:28 a.m. and 10:33 a.m., steps were recorded on Teresa's Fitbit, but no further steps were recorded after 10:33 a.m. Once EMS arrived on scene at 11:44 a.m., there was a spike in activity which Dr. Diaz attributed to EMS moving Teresa's body and administering CPR. He did not see any indication that CPR had been done prior to EMS' arrival, such as spikes in heart rate or steps, although, he could not rule it out either.

{¶ 25} After the 42-minute period of likely non-wear, Teresa's heart rate was quite elevated compared to the rest of her day. Her heart rate was elevated between 10:33 a.m. and 10:35 a.m. For two of those three minutes, Teresa did not take any steps, and the other minute, she only moved 17 steps, which is generally considered incidental movement and not purposeful walking. According to Dr. Diaz, the elevation in heart rate

was not due to physical activity but it could have been due to a negative emotion or physical activity like heavy lifting that the device cannot capture.

{¶ 26} The State also presented the testimony of Katherine Marker, who first met Richard at a horse show in 2014 or 2015; they became Facebook friends. In November 2019, Marker and Richard met in Greenville, Ohio, with some friends, and they started dating soon thereafter, spending time together practically every weekend.

{¶ 27} On New Year's Eve 2019, Richard and Marker spent the night at the Quality Inn in Greenville. That was the first time their relationship became sexual. After that, they met nearly every weekend and stayed at the Quality Inn. The location was convenient because it was halfway between Richard's home and Marker's home. Between December 31, 2019, and March 14, 2020, Richard paid for the hotel room in cash seven times while Marker paid for the room with her credit card twice. They only stopped going to the hotel due to Covid, but the couple continued to see each other. Although Richard would visit her farm in Pleasant Hill, Ohio, Marker only went to Richard's home once, on a weeknight in April a few weeks before Teresa's death. Although they had plans to meet at Richard's during weekends in April, he made several excuses for her not to come to his residence, including a time when he claimed his "ex" stopped by to pick up some things and was still there.

{¶ 28} Richard told Marker that he had gotten divorced in 2016 or 2017, and Marker was under the impression that Teresa lived in Troy. On one occasion, Richard commented to someone in Marker's presence that a divorce cost $80,000, and Marker was led to believe that Richard had to sell off some of his farm to pay off Teresa in the

divorce.

{¶ 29} During the month of April 2020, Marker and Richard texted each other throughout the day and usually talked on the phone in the evenings. On Thursday, April 23, 2020, Marker and Richard texted about her coming to visit him at his home the following day before lunch time so they could spend the weekend together. Richard claimed he was given Friday off with pay and that he had put in for vacation the following Monday through Wednesday. Richard texted Marker that "[a]fter this weekend just every Saturday morning head my way[.] Your [sic] more important than anyone else I mean that[.] Love you[.]"

{¶ 30} On Friday morning, April 24, 2020, Richard texted Marker that he had some errands to do and had forgotten that he had a doctor's appointment at 11 a.m. He said Marker could come to his place after he got home. At 12:10 p.m., four minutes before Teresa was declared dead, Richard texted Marker to say he was going to call her in a bit and "don't give up," meaning that he still planned to meet with her that day. Richard then called her around 12:30 p.m. He was very upset and crying on the phone when he told her that he had found Teresa in the garage and there was blood everywhere. He said that there was a ladder and apparently Teresa climbed up the ladder to get a basket that had something their son, Casey Bowman, may have hidden in it. He told Marker that he called 911 and they talked him through CPR, but Teresa had died. Later that night, Marker drove to the Bowman residence, and she spent the weekend with Richard. Although she was a nurse, she went to his house as his girlfriend, not because she was a nurse. On the same night as Teresa's death, Richard and Marker had sex.

{¶ 31} Marker stayed with Richard until Monday. During the weekend, Richard told Marker that when he tried to revive Teresa he had gotten blood all over his clothes. She asked him if the police took the clothes as evidence and he said no, he burned them. Although she did not see him burning the clothes, she did see him burning other items while she was there. She identified from the still photos of Richard's visit to the Dollar General that he appeared to be wearing his black Carhartt vest.

{¶ 32} After Richard's interview on April 26, 2020, his cell phone was seized and searched. Police attempted to locate Richard's text messages with Marker that she had provided to them, but they had been deleted from his phone. Additionally, the phone was unable to provide any GPS locations to show where Richard had been on the day of the murder.

{¶ 33} Michael Hartzell was Richard and Teresa's supervisor at Clopay. He testified that both Richard and Teresa had been scheduled to work on April 24, 2020, but he received a call that day around 12:30 p.m. from Richard saying that they would not be in due to Teresa's death. According to Hartzell, Richard did not have any vacation time available and he had not made a vacation request for the following week. However, if a close loved one died, the company policy provided three days paid bereavement leave.

{¶ 34} Teresa had a life insurance policy at Clopay that designated Richard as the primary beneficiary. As a result of Teresa's death, Richard was expected to receive more than $275,000 from her life insurance and 401(k) plan. Had Teresa died of an accident, Clopay would have paid an additional $44,000 to her beneficiary. Teresa's will listed Richard as her sole beneficiary.

{¶ 35} Brian Mader, who had a lengthy criminal record, testified about a conversation he had with Richard while both were in custody in the Darke County Jail in August 2020.   Mader did not know Richard prior to meeting him in the jail or with what offense Richard had been charged.   Because Mader had been in custody at one jail or another for several months, he had not heard or read anything about Richard's case.

{¶ 36} At the time of their conversation, Richard had just learned that he was bonding out of jail and started talking about his case.   Mader testified that Richard told him the police missed finding a two-by-four that he had used to hit his wife in the head.   Richard told him that he burned the two-by-four in the stove along with some clothes and commented that they would never find the murder weapon because it had burned.   Richard claimed that the police had missed the crime scene and that his family came over to mourn his wife and trampled through the blood.   Richard described there being a puddle of blood by a truck.

{¶ 37} According to Mader, Richard and his new girlfriend wanted to get their own place, and Richard's wife found out about it.   Mader also claimed that Richard talked about the money he was going to get from his wife's death and how he used the stimulus check that was loaded on a card to show the police that money was not a motive.   Richard additionally told Mader about being out in the garage and that he had used a rope to do it, but then quickly caught himself and said "they used a rope."   Richard did not tell Mader that his wife was killed with the rope, just that it had been around her neck.

{¶ 38} Based on Richard's disclosures, Mader contacted Detective Sergeant Clark and told him what he had heard.   Although Mader hoped to gain something from talking

to Clark, he was not promised anything to testify against Richard and received no benefit for doing so. Mader did tell Clark that Richard said Teresa was found in a field, even though she was not. Mader had also not initially mentioned to Clark that Richard claimed the two-by-four or the clothes had been burned, although he testified to that at trial.

{¶ 39} After the State rested, Richard moved for an acquittal under Crim.R. 29, which was denied. He then put on several defense witnesses. Dr. Steven Mattingly testified as an expert for the defense in the analysis of Teresa's Fitbit data. According to Dr. Mattingly, the Fitbit can provide inaccurate heart rate measurements and inaccurate step counts. He explained that one's heart rate could increase for several reasons such as standing up from a sitting position, exercise, excitement or fear.

{¶ 40} Dr. Mattingly agreed with Dr. Diaz that it was likely Teresa was wearing her Fitbit at the time of her death. However, Dr. Mattingly believed that the data after 9:28 a.m. was not reliable based on low confidence values after that time period, the period of missing data from 9:47 a.m. until 10:28 a.m., and because the device was not worn long enough after that point to re-establish quality data. He acknowledged there was a high confidence level for the heart rate measurement at 10:33 a.m., when a high heart rate was detected. After that, however, there was a declining heart rate value and declining confidence levels. Thus, while Dr. Mattingly agreed that Teresa's heart rate level was elevated at 10:33 a.m., he did not agree that it was necessarily high for the next couple of minutes. He also agreed that the step counter is generally considered much more reliable than the heart rate data.

{¶ 41} Rachel Newton, a forensic scientist with the MVRCL, testified about a hair

of undetermined sematic origin that was found on Teresa's jacket. She described it as a light blonde hair that was shorter than the other head hairs collected and had different characteristics. This was the same hair that was sent to Barger for DNA analysis, but no DNA could be found. Although Newton could tell the unknown hair was human hair, she was unable to tell whether the hair came from a male or female, how old the person was, how long the hair had been on the jacket, or how the hair got onto the jacket. She testified it was possible the hair could have transferred there from a chair Teresa sat in or could have been there for months if the coat had not been laundered.

{¶ 42} Darke County Sheriff's Office deputy Detective Rodney Baker interviewed Amber Deregnaucourt a day or two after April 24, 2020; she told him that Richard had appeared upset and had been shaking a little bit on the day of Teresa's death. He likewise interviewed Scarlet Strait, who was initially considered a suspect. Strait admitted to Baker that she had had arguments with Teresa before, usually about Casey Bowman, who was the father of Strait's daughter. Strait told Baker that she had wished death upon Teresa before, but said she had not really meant it. Teresa had been paying some of Casey's child support since he was not paying it. According to Strait, in 2018, she and Teresa had had an argument over the custody of her daughter, but they were getting along in 2020. Two weeks before Teresa's death, Teresa had brought over some Easter presents and Christmas presents for Strait, Strait's daughter, and Strait's mother.

{¶ 43} At the time of Teresa's death, Strait told Baker that she had worked the night before and therefore was asleep until 1 p.m. on April 24. Strait's mother confirmed that Strait was at home, sleeping until 1 p.m. Baker obtained Strait's phone records and

forwarded the data to the Ohio Bureau of Criminal Investigations ("BCI").

{¶ 44} At trial, Strait testified that she lived with her mother and eight-year-old daughter, Alice, in April 2020. She stated that she had not been to the Bowmans' house for probably two years and had sole custody of Alice, who rarely saw Casey due to his frequently being incarcerated. She testified that she worked the evening of April 23, 2020, into the early morning of April 24, 2020. By the time she got off work, got home, and went to sleep, it was probably around 4 a.m. and she did not get up until 1 p.m., when she had to get ready to return to work. She denied talking to anyone in person while at home but said she may have been texting on her phone.

{¶ 45} The defense presented the BCI phone records at trial, which showed that Strait's phone had incoming and outgoing text messages between 4:13 a.m. and 7:57 a.m. There were two incoming calls at 10:15 a.m. and 10:16 a.m. from the same number, which may have been robo-calls, but it was undetermined if those calls were answered. At 11:40 a.m., Strait's phone received an incoming text and two minutes later, it sent out an outgoing text. The phone records did not provide any of the text content, and her phone was never collected by the police.

{¶ 46} Strait testified that she learned that Teresa may have fallen off of a ladder and died in a Facebook message from her friend, Sheena Hill. Hill's mother worked at Clopay with the Bowmans. Brian Mader is Hill's cousin, whom Strait acknowledged she had met, but she said it was when she was less than 10 years old while at her friends' family get-together. She had not met with Mader in at least the past 5 years.

{¶ 47} Strait admitted she argued with Teresa a lot, usually about Casey, who

owed Strait money for child support. In 2018, Casey tried to get custody of Alice, but Strait retained custody. Strait was mad at Teresa for helping Casey go after custody of Alice. Strait admitted she had a temper and sometimes would lose her cool, but she denied ever harming Teresa.

{¶ 48} By April 2020, Strait claimed that she and Teresa were getting along and not arguing. Teresa helped Strait with money for Alice and paid the minimum amount of Casey's child support to keep him out of jail. Teresa also gave Alice clothes and things and was a good grandmother, according to Strait. Strait denied ever begging Teresa for money and stated that Teresa was the only person in the Bowman family who helped her. However, Strait and Maria Gallegos, Cindy Bowman's daughter, did not get along. In a drunken message, Strait accused Richard, Cindy, and Gallegos of not caring about Teresa and also of killing her.

{¶ 49} Both Cindy Bowman and Maria Gallegos testified for the defense. They stated that in April 2020, Richard had two horses that he kept in the horse barn on Disher Road not far from his home. According to Cindy, Teresa had stopped riding horses after having fallen off several times. After an accident with her leg, Teresa no longer had the best balance and limped. Cindy and Gallegos claimed that it was normal for Richard to sleep in his own bedroom while Teresa slept on a couch in another room. They explained that Richard frequently changed his clothes and took multiple showers a day because he liked to be clean. Both of them claimed it was common for the Bowmans to burn clothing and other items, like trash, at their home.

{¶ 50} Both women testified that they were aware Richard dated other women.

Gallegos claimed that she would go with Richard and his girlfriends to horse shows or trail riding and that she was not aware of Teresa getting mad about Richard's having a girlfriend as long as word of it did not get to Teresa's side of the family or to work. Cindy stated that she had never seen her parents argue about Richard's girlfriends, but she did not want to hear from either of her parents about his having girlfriends because she did not want to be in the middle of anyone else's drama. Neither woman had met Marker until the day after Teresa died.

{¶ 51} Gallegos stated that she had seen Teresa and Strait argue before and claimed they mostly argued about money or about things that had been misplaced when Alice was returned to Strait after visits. Gallegos claimed that Strait would demand Teresa pay Casey's child support obligation and they would get into screaming matches. She recalled Strait showing up to the Bowmans' house late one night before Teresa's death screaming about money. On another occasion, several years prior, Gallagos claimed to have seen Strait and Teresa arguing about a binky; when Teresa handed it to Strait, Strait threw it back at Teresa. That was the only time Gallegos had seen anything physical between the two.

{¶ 52} Cindy stated that she had never seen Teresa and Strait argue, but she had seen Strait with a temper. Strait would text her and be irate, then she would text later saying that she was having a bad day and was sorry. Strait texted Cindy through Facebook after Teresa's death, sending condolences and asked what happened. Cindy claimed that throughout their conversations, Strait asked about the facts of the case as well as about Casey.

{¶ 53} Cindy learned of her mother's death on April 24, 2020, from her fiancé. When she got to her parents' house, she saw some tire tracks which she showed to someone, but she was told they were from the ambulance. No one took any photos of them. After Teresa's body was removed, Cindy saw blood on the garage floor and pointed out a handprint on the door. Cindy testified that the door to the garage where Teresa's body was found was usually open, and she could not recall a time when it had ever been closed. Although Cindy did not visit her parent's house often in 2020 due to Covid, she had visited in the first part of April 2020 because it was their wedding anniversary.

{¶ 54} After the defense rested, the State put on Scarlet Gross, Strait's mother, as a rebuttal witness. She confirmed that Strait had been sleeping on the morning of April 24, 2020, and did not get up until Gross woke Strait up for work around 1 p.m. Gross also testified that she had only heard Strait and Teresa argue one time a couple of years earlier.

{¶ 55} After Gross's testimony, Richard renewed his Crim.R. 29 motion. which was again denied. Upon consideration of the evidence, the jury returned a verdict of guilty as charged. Richard was sentenced to a mandatory term of life in prison with the possibility of parole after 20 years. Richard timely appealed.

## II.  Assignments of Error

{¶ 56} In Richard's first assignment of error, he alleges that the trial court erred in denying his Crim.R. 29 motion for acquittal at the close of the State's case as well as at the close of all the evidence. He then argues in his second assignment of error that the

verdict was against the manifest weight of the evidence. Because of the interrelation of Richard's assignments of error, we will first consider whether the trial court erred in denying the defense's Crim.R. 29 motion at the close of the State's case-in-chief. We will then consider whether the manifest weight of the evidence supported Richard's conviction. That determination is also dispositive of the issue of the sufficiency of the evidence.

> **a. The trial court did not err in denying appellant's Crim.R. 29 motion at the end of the State's case-in-chief.**

{¶ 57} Richard asserts that the State's alleged motive was not compelling, that there was no forensic evidence to tie him to the murder, and that the police failed to adequately investigate. Richard argues that even when viewed in the light most favorable to the State, there was insufficient evidence for the trial court to deny his Crim.R. 29 motion. We disagree.

{¶ 58} A Crim.R. 29 motion challenges the legal sufficiency of the evidence and, therefore, a trial court's ruling on a Crim.R. 29 motion is reviewed under the same standard that applies to a review for sufficiency of the evidence. *State v. Kennard*, 2d Dist. Montgomery No. 29201, 2022-Ohio-2055, ¶ 17. But when reviewing a trial court's denial of a Crim.R. 29(A) motion for acquittal made at the completion of the State's case-in-chief, an appellate court's review is limited to the evidence then available to the trial court. *State v. Bailey*, 2d Dist. Montgomery No. 27177, 2017-Ohio-2679, ¶ 17, citing *State v. Sheppeard*, 2d Dist. Clark No. 2012-CA-27, 2013-Ohio-812, ¶ 51.

{¶ 59} Pursuant to Crim.R. 29(A), a court "shall order the entry of the judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction

of such offense or offenses." "When determining a Crim.R. 29 motion, the trial court must consider the evidence in a light most favorable to the state and determine whether reasonable minds could reach different conclusions concerning whether the evidence the state presented, if believed, proves each and every element of the offense charged beyond a reasonable doubt." *State v. Sowry*, 155 Ohio App.3d 742, 2004-Ohio-399, 803 N.E.2d 867, ¶ 8 (2d Dist.), citing *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978). "A Crim.R. 29 motion must be granted when reasonable minds could only conclude that the evidence fails to prove the elements of the offense." *Id.*, citing *State v. Miley*, 114 Ohio App.3d 738, 684 N.E.2d 102 (4th Dist.1996).

{¶ 60} When considering the legal sufficiency of the evidence, appellate courts do not engage in a determination of witness credibility. *State v. Goff*, 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998). Rather, the relevant inquiry is whether the evidence presented, if believed, was sufficient to support the conviction. *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, ¶ 16, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). "Because a Crim.R. 29 motion presents an issue of law, our review of the trial court's denial of the motion is de novo." *Sowry* at ¶ 8, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991).

{¶ 61} Richard was convicted of aggravated murder, an unclassified felony, in violation of R.C. 2903.01(A). That statute proscribes purposely causing the death of another with prior calculation and design. R.C. 2903.01(A). "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender

intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."   R.C. 2901.22(A).

{¶ 62} The phrase "prior calculation and design" suggests " 'an act of studied care in planning or analyzing the means of the crime, as well as a scheme compassing [sic] the death of the victim.   Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must be sufficient to meet the proposed test of "prior calculation and design."   In this context, momentary deliberation is considered insufficient to constitute a studied scheme to kill.' " *State v. Walker*, 150 Ohio St. 3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 17, quoting Ohio Legislative Service Commission, *Proposed Ohio Criminal Code: Final Report of the Technical Committee to Study Ohio Criminal Laws and Procedures*, at 71 (1971). Although there is no bright-line test to determine prior calculation and design, three factors are often considered when determining whether a defendant acted with prior calculation and design: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?' "   (Citations omitted.) *Walker* at ¶ 20.   However, these factors are not dispositive, and "a trier of fact's finding of prior calculation and design is warranted when the evidence shows a defendant had the time and opportunity to plan a homicide and the homicide's circumstances show a scheme designed to implement the calculated decision to kill."   (Citations omitted.) *Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, at ¶ 17.

{¶ 63} In the present case, the evidence the State presented, if believed, was sufficient to constitute the offense of aggravated murder in order for the trial court to overrule Richard's Crim.R. 29 motion. We first note that while Richard argues that the police could have or should have done a better investigation, "the state need only have had sufficient evidence, not the best possible evidence, to survive a challenge on insufficiency grounds." *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 166. Likewise, the State is not obligated to produce DNA or other physical evidence linking a defendant to the crime scene in order to secure a conviction based on sufficient evidence. *State v. Poindexter*, 10th Dist. Franklin No. 19AP-394, 2021-Ohio-1499, ¶ 22. Thus, our review is based on the sufficiency of the evidence that was presented by the State at trial.

{¶ 64} The State presented evidence of Richard's on-going affair with Marker to demonstrate not only a motive, but also his planning and preparation. Though the State is not required to prove motive, motive "is relevant to most criminal trials in that it helps corroborate that certain acts took place because a person had a reason to act in a certain manner." *State v. Gonzalez*, 7th Dist. Mahoning No. 06 MA 58, 2008-Ohio-2749, ¶ 71, citing *State v. Nichols*, 116 Ohio App.3d 759, 764, 689 N.E.2d 98 (10th. Dist.1996). Richard and Teresa were married and had lived together at their rural home for over 40 years, although they had not shared a bed for over 20 years. They were not divorced but, according to Richard, they had talked about getting a divorce several years prior. Richard told police two days after Teresa's murder that he did not have sexual relationships with any women, yet he had been in an on-going sexual relationship with

Marker since December 31, 2019, and in fact had had sex with Marker the day Teresa died. Between December 31, 2019, and March 14, 2020, Marker and Richard met at a hotel nearly every weekend. Once Covid began in March 2020, Marker was unwilling to go to the hotel anymore. Therefore, they began visiting each other at Marker's residence and only once visited at Richard's residence for an evening on a weeknight in April. Even though they planned to meet at Richard's place during weekends in April, Richard repeatedly cancelled. Richard purportedly told Brian Mader that he and his new girlfriend wanted to get their own place and his wife found out about it.

{¶ 65} Although the police were able to obtain Marker's text messages with Richard from her phone, by the time of Richard's interview two days after Teresa's murder, he had deleted them on his phone. The day before Teresa's murder, Richard texted Marker that he was taking three days' vacation the following Monday when he neither had any vacation time available nor had put in a request for vacation time. Yet, per company policy, he would be entitled to get those three days' paid time off for bereavement leave if a close family member died. Further, although he was scheduled to work on Friday afternoon, he told Marker his boss gave him the day off and she should come to his place at 11 a.m. Significantly, Richard told Marker that from then on, she should just come to his place every Saturday. This would have been unlikely to occur if Teresa were still alive, especially considering that Richard had told Marker he was divorced and had led her to believe that Teresa lived in Troy. Nor would it make sense because Richard had previously cancelled weekend plans in April with Marker because he told her that his "ex" was there to pick up things and had not yet left. However, on the

day Teresa died, Richard texted Marker at 12:10 p.m., four minutes before his wife of 40 years was declared dead, to say he would call her and not to give up on them getting together. In his phone call to her at 12:30 p.m., he informed her of Teresa's death. Marker came to Richard's home that night and spent the weekend with him at his home for the first time.

{¶ 66} The State also presented evidence of a pecuniary motive for Teresa's murder. Richard was set to gain over $275,000 if Teresa were to die, and an extra $44,000 if it were an accidental death. While Richard may not have known the exact amount of money he would receive, he did work at the same company as Teresa where she had been working for over 25 years. Richard and Teresa had separate bank accounts and sometimes helped each other with money, such as Teresa's helping him purchase a new bike the summer before she died. Richard's only explanation to police for why he would not have killed his wife was due to monetary reasons: they both worked and were making money, buying stuff, and getting their bills all paid up. But that would also be accomplished by collecting Teresa's death benefits. Richard had commented in Marker's presence that a divorce costs $80,000, something he would not have had to pay if Teresa were dead. The day before Teresa's death, Richard texted Marker that his bank account was not very big anymore because they "lived high on the hog" over the winter. Richard also talked to Mader about the money he was going to get from his wife's death and how he had used the stimulus check card to show the police that money was not a motive.

{¶ 67} As for whether Richard would be entitled to the extra $44,000 if Teresa's

death were accidental, Richard initially portrayed Teresa's death as an accident. Richard knew that Teresa had balance issues due to her knee injury, and he made it sound as though Teresa had accidentally fallen off a ladder. He told the 911 operator that Teresa had hit her head on the truck because she was only bleeding from the back of her head and there was blood on the truck. The only blood found on the truck was a bloody handprint on the running board near the front driver's side of the truck. During his interview, Richard claimed that he had not seen the bloody handprint until police pointed it out to him. Likewise, although Richard claimed to have attempted CPR on Teresa and to have gotten blood all over himself, no one observed blood on him or his clothing. In contrast to his 911 call, Richard claimed in his interview that he had not gotten any blood on himself besides a little on his hands. He also claimed that his black tennis shoes and Carhartt vest, which Marker identified Richard wearing in the Dollar General surveillance photos, had been stolen. However, he told Marker that rather than turning over the clothes that he had worn when he found Teresa to the police, he had burned them because there was blood all over them.

{¶ 68} Richard claimed to have been crawling around on his hands and knees on the floor during his attempts to perform CPR and rolling Teresa's body around. Yet no dirt from the garage was observed on his clothing. Further, although Dr. Diaz could not rule out that Richard had performed CPR on Teresa, he did not see any spikes in heart rate or steps prior to EMS's arrival to support Richard's allegation that he had administered CPR and moved Teresa's body. It would have been unnecessary for Richard to try to perform CPR if he knew, or wanted, Teresa to be dead. Richard told

Mader that he used a two-by-four to hit his wife in the head and that he had later burned it in a stove. Richard also told Mader that he had burned his clothes, consistent with his statement to Marker, and that the murder weapon would never be found because it was burned too.

{¶ 69} Notably, before anyone knew that Teresa had been murdered, Richard fabricated an alibi. Before Teresa's murder, Richard postponed Marker's arrival that morning and feigned that he had a doctor's appointment at 11:00 a.m. After Teresa's murder, Richard told several people he had been running errands for two hours, and he provided police with a detailed route including multiple locations he claimed to have visited during that time. When it was discovered that Richard had lied about where he had been, he explained that he lied because he knew they were going to blame him for Teresa's death. But, as the detectives explained, if it had been an accident and he had nothing to do with it, he would not have needed to create an alibi.

{¶ 70} In determining an approximate time of death, Teresa's last Facebook message was posted at 10:30 a.m. and, therefore, she was presumed alive at that time. Dr. Diaz concluded that Teresa was wearing her Fitbit at the time she was murdered and that the device showed an elevated heart rate between 10:33 a.m. and 10:35 a.m. According to the accelerometer, which was highly accurate, the Fitbit recorded no further steps after 10:33 a.m. until EMS arrived on scene at 11:44 a.m., at which point, there was a spike in activity for both heart rate and steps due to EMS' manipulating Teresa's body and administering CPR. Based on this evidence, the State argued that Teresa was murdered around 10:33 a.m.

{¶ 71} Richard was seen on video at 11:01 a.m. at the Dollar General store. Detective Didier testified that the one-way trip driving from the Bowman's residence to Dollar General took only eight minutes and eight seconds. Richard made sure to provide his Dollar General receipt to the police and was adamant Deputy Moody see his text to Teresa at 11:21 a.m. asking if they needed bread. He originally claimed he texted Teresa while he was still at the store, but later stated he texted her while he was on Disher Road, just before he got home. Considering the timeline, there was more than sufficient time for Richard to have killed Teresa around 10:33 a.m., driven to the store to purchase one item to assist his alibi, and returned home before calling 911 at 11:28 a.m.

{¶ 72} Further, the evidence of Teresa's death and the crime scene, coupled with the evidence previously discussed, indicate that the murder was planned. Richard stated in his interview that he saw Teresa put her coat on and that she told him she was going to go to the garage. He told police he did not see anyone else around and there was no one visiting their rural property that morning. While in the garage, Teresa was struck in the back of the head. Although the blow was not sufficient to have killed her, it likely stunned her. According to Richard's statements to Mader, Richard used a two-by-four to strike her in the head, which he later burned. Dirt on Teresa's clothing and both hands, along with the abrasions on Teresa's chin and lips, could have been caused from falling after being struck in the back of the head. Teresa's right hand had blood on it, likely from touching the back of her head, which was the only place from which she was bleeding. Her bloody right thumb print was found on the running board of the truck. Considering the location of the hand print, it appears that she was on the ground or low

to the ground when she placed her hand onto the running board. According to the autopsy, Teresa was strangled after she was struck in the head. The manner of the attack suggests forethought and the calculated decision to kill, not just injure, such that a jury could reasonably conclude that the force used to kill Teresa, and the sequence of events in the garage, demonstrated prior calculation and design. *See State v. Ivy*, 5th Dist. Delaware No. 20 CAA 090034, 2021-Ohio-3970, ¶ 69.

{¶ 73} When analyzing the evidence in the light most favorable to the State, we find that there was sufficient circumstantial evidence for reasonable minds to conclude that Richard strangled Teresa to death and that he did so with prior calculation and design. We acknowledge that the evidence against Richard was circumstantial insofar as no one saw him kill Teresa; however, it is well established that direct and circumstantial evidence both possess the same probative value. *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001). Further, "[a] conviction can be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 154-155, 529 N.E.2d 1236 (1988). We therefore overrule Richard's first assignment of error concerning the trial court's denial of his Crim.R. 29 motion at the completion of the State's case.

> **b. The trial court did not err in overruling appellant's Crim.R. 29 motion at the close of all the evidence as his conviction for aggravated murder was not against the manifest weight of the evidence and, therefore, necessarily supported by sufficient evidence.**

{¶ 74} In his remaining arguments, Richard asserts that the jury lost its way and returned a verdict that was against the manifest weight of the evidence and insufficient to

uphold a verdict of guilty. Having reviewed the entire record in this case, weighed the evidence and all reasonable inferences, and considered the credibility of the witnesses, we conclude that Richard's conviction was not against the manifest weight of the evidence and, therefore, his conviction was supported by sufficient evidence.

{¶ 75} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). However, "[w]here an appellate court determines that a conviction is not against the manifest weight of the evidence, the conviction is necessarily based on legally sufficient evidence." *State v. McLoughlin*, 2d Dist. Champaign No. 2017-CA-22, 2018-Ohio-2426, ¶ 8; *State v. Million*, 2d Dist. Montgomery No. 24744, 2012-Ohio-1774, ¶ 23.

{¶ 76} "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice" such that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Because the trier of fact sees and hears the witnesses at trial, we must defer to the fact finder's decisions whether, and to what extent, to credit the testimony of

particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 77} The essence of Richard's argument is that the testimony of Brian Mader was not credible and the police did not conduct an adequate investigation into alternate suspects. First, defense counsel brought the credibility issues of Mader to the attention of the jury at trial, which presumably took them into consideration and, nevertheless, reasonably decided to believe this testimony. Although a weight-of-the-evidence argument allows a reviewing court to consider the credibility of the witnesses, that review must be tempered by the principle that questions of weight and credibility are primarily for the trier of fact. *State v. Goldwire*, 2d Dist. Montgomery No. 19659, 2003-Ohio-6066, ¶ 13, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. This is because the fact finder "is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Just because Mader had a lengthy criminal record did not mean that the jury could not find him credible. Moreover, Mader's testimony was not so unbelievable as to be totally lacking in credibility. While there may have been inconsistencies in Mader's testimony when compared to the evidence presented at trial, "[a] defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial." *State v. Gray*, 2d Dist.

Montgomery No. 26139, 2016-Ohio-1419, ¶ 66, citing *State v. Anderson*, 10th Dist. Franklin No. 10AP-302, 2010-Ohio-5561, ¶ 12.

{¶ 78} Richard also argues that the police botched the investigation in failing to pursue alternate suspects, which creates enough reasonable doubt that his conviction should be reversed. He relies on the evidence of the unknown DNA found on the doorjamb of the sliding garage door and the unidentified blonde hair found on Teresa's jacket to suggest that an unknown suspect committed the murder rather than Richard. He alleges the items could have come either from one of Casey's unknown associates or from Strait.

{¶ 79} Barger testified that the blood from the doorjamb was a partial profile and that there was such a small amount of DNA that she could not use it to definitively say that it matched anyone. She could only say that it did not match someone if she had a DNA sample to compare it to. Barger explained that DNA recovery depends on several factors including exposure to the environment, the location of the DNA, and how much DNA was deposited. While Barger could identify if DNA was present, she could not determine how the blood got there or the length of time it had been there.

{¶ 80} Witnesses testified that the sliding garage door was always open, meaning that the area of the doorjamb was always exposed. When Detective Prickett was on scene on April 24, 2020, she observed the sliding garage door partially open, completely closed, and completely open, and did not observe the small blood drop that day. Two days later, Deputy Neth collected the small blood sample. Several individuals testified that people came over to the Bowmans' residence after Teresa's death. According to

Mader, Richard said that his family came over to mourn his wife and they all trampled through the blood. Considering this evidence, the jury could have reasonably determined that the blood sample recovered from the doorjamb was unrelated to the murder either because Prickett missed it and it had been there prior to the murder, or because someone contaminated the scene between the time Pricket collected evidence and the time Neth collected evidence.

{¶ 81} In a similar vein to his argument regarding the unknown DNA, Richard claims that the unknown blonde hair also created to a reasonable doubt sufficient to overturn his conviction. The hair was recovered from Teresa's jacket, which she wore every day. Newton explained that although it was a human hair, she could not identify how long the hair had been on the coat or how it had gotten there. Newton testified that hairs could be transferred from one place to another very easily, such as from sitting in a chair someone else had been sitting in. Further, if the coat had not been laundered, the hair could have been there for months. Thus, the jury could have reasonably determined that the single blonde hair was unrelated to the murder. In any event, we do not find that the unknown blood sample or the unknown hair justify reversal on the basis that the conviction was against the manifest weight of the evidence.

{¶ 82} The defense's alternate suspects at trial were either an unknown possible acquaintance of Casey's or Scarlet Strait. Casey was in jail at the time of his mother's murder and was frequently in jail for nefarious activities. Based on Richard's interview with police, he suggested that Teresa was going out to the garage on the day of her murder to look for something for Casey and that Casey's associates may have killed

Teresa.   Richard also told the police to check Teresa's messages and accounts because Casey's friends had threatened her.   However, the deputies looked into Teresa's cell phone and did not locate any threatening messages.   There was also evidence that Teresa paid off Casey's debts and fully supported him, suggesting that there would be no motivation for Casey's associates to kill her.

{¶ 83} While Strait had stated she wished Teresa dead, she also said that she did not mean it.   Teresa and Strait had a strained relationship as a result of Casey's lack of support for his and Strait's daughter, but there was also evidence that Strait and Teresa were getting along in April 2020.   According to Strait, Teresa was the only person in the Bowman family that assisted her and her daughter.   Importantly, the jury heard evidence that Strait had an alibi, wich was supported by the testimony of her mother.   They also heard that the police did in fact investigate Strait as a possible suspect, but they ruled her out.

{¶ 84} Having considered all the evidence, " 'the jury was free to believe, or disbelieve, any part of the witnesses' testimony, and a conviction is not against the manifest weight of the evidence merely because the jury believed the prosecution's testimony.' "   (Citation omitted.) *State v. Pheanis*, 2d Dist. Montgomery No. 26560, 2015-Ohio-5015, ¶ 36, quoting *State v. Arega*, 2012-Ohio-5774, 983 N.E.2d 863, ¶ 30 (10th Dist.).   Because the trier of fact is in the best position to determine the credibility of each witness by taking into account any inconsistencies, as well as the witnesses' manner and demeanor, we cannot conclude, upon review of the entire trial, that Richard's conviction presents a scenario where the jury clearly lost its way or a manifest injustice was created.

The State produced substantial evidence that would allow a reasonable juror to conclude that Richard murdered Teresa with prior calculation and design. Because we do not find that the conviction was against the manifest weight of the evidence, we necessarily find that the State presented sufficient evidence to uphold the conviction. Richard's two assignments of error are overruled.

### III.    Conclusion

**{¶ 85}** Having reviewed the entire record, we cannot find that the trial court erred in overruling each of Richard's Crim.R. 29 motions. We also do not find that the evidence weighed heavily against his conviction or that a manifest miscarriage of justice occurred. Both of Richard's assignments of error having been overruled, judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and EPLEY, J., concur.

Copies sent to:

R. Kelly Ormsby, III
H. Michele Thomas
Hon. Jonathan P. Hein